## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:25-cr-20398-MSN |
| | ) | |
| TRAVIS PARTEE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Travis Partee's Motion to Suppress Evidence, filed April 24, 2026.  (ECF No. 21.)  District Judge Mark S. Norris referred the motion to the undersigned for report and recommendation.  (ECF No. 36.)  The United States responded in opposition on May 8, 2026.  (ECF No. 39.)

The Court held a hearing on May 15, 2026.  (ECF No. 41.)  At the hearing, the United States called one witness, Trooper Donald Seiber, and introduced into evidence one exhibit, a drive containing a video file from a body-worn camera (Exhibit 1).  Partee called himself as a witness and introduced no exhibits.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibit, and the entire record in this case, the Court recommends that the motion be denied.

### PROPOSED FINDINGS OF FACT

The following proposed facts are taken from the sworn testimony presented at the suppression hearing.  Where factual conflicts were presented, these facts represent the

undersigned's resolution of those conflicts after considering the credibility of the witnesses and supporting evidence.

Trooper Seiber is a Tennessee State Trooper. He has held that position for ten years, with another three years of prior law-enforcement experience. He is assigned to a full-time criminal interdiction unit. On average, he stops between twenty and thirty cars per shift, and he estimates that about half of those stops involve window-tint violations. Given that volume and the length of his career, he estimated that he has conducted tens of thousands of window-tint stops.

Trooper Seiber has received two kinds of training regarding window-tint violations. First, he went to interdiction school taught by his direct supervisors, which is three days long and covers window-tint certifications and training. Second, he took a course required by the manufacturer of his window-tint meter (Laser Labs)—the meter he used during the stop at issue in this case—regarding the device and how to use it. At the end of the course, he was required to take a test and was given a certificate.

Trooper Seiber testified that, on November 25, 2025, at 2:00 p.m., he was parked on Cottonwood Road at its intersection with South Goodlett Street in Memphis, Tennessee. He saw a black 2011 Chevrolet Tahoe turn off South Goodlett onto Cottonwood and pass in front of him. As it passed, Trooper Seiber testified that all four windows of the Tahoe were rolled up, and he noticed that all four windows were very darkly tinted.

In a nearby unmarked silver Silverado were two additional troopers from the Tennessee Highway Patrol's Special Investigations Bureau. One was Trooper Al Seitner, who is also a task force officer with the FBI; the other was a sergeant with the Special Investigations Bureau whose name was not provided at the hearing. Trooper Seiber had been communicating on an unrecorded "talk-around channel" with these two other troopers, using that channel to talk

2

because their radio was very busy.  Trooper Seiber testified that those troopers also saw the Tahoe as it passed them on Cottonwood, observed all four windows rolled up, and pointed it out to him because of the dark window tint.  When those troopers contacted Trooper Seiber with that information, however, he had already seen the Tahoe and had pulled out to go stop it.

Trooper Seiber passed through the intersection and drove to catch up to the Tahoe.  As he did so, he briefly lost sight of the Tahoe and then, after about a mile, saw the Tahoe making a left turn off Cottonwood onto Dearing Cove.  At that point Trooper Seiber turned on his blue lights to initiate a traffic stop.  He testified that less than a minute passed between him first seeing the Tahoe and the stop.

Trooper Seiber testified that, when the Tahoe traveled past him, all four windows were rolled up.  The Tahoe was relatively close to him, and he could see how dark the tint was with his own eyes.  It was light outside, and Trooper Seiber also testified that it was a chilly November day and no one was riding around with their windows down.  He acknowledged that he was not wearing a heavy coat, but he testified that he was dressed in Kevlar, tends to stay hot, and frequently does not wear a coat in the winter.

Trooper Seiber was wearing a body-worn camera that day, but the recording was not initiated until he turned on his blue lights, at which point the recording backed up thirty seconds. The video thus begins with Trooper Seiber beginning to drive down Cottonwood and then taking a left on Dearing Cove and pulling up behind the Tahoe.  The video clearly shows that the front driver and passenger windows of the Tahoe were rolled down as Trooper Seiber walked toward it.  Trooper Seiber testified that, during the approximately one minute between him seeing the Tahoe and pulling it over, the occupants of the Tahoe rolled the front windows down but left the

3

back windows up.  He testified that it is common for the occupants of vehicles he pulls over to roll down their windows as he approaches.

The video depicts Trooper Seiber getting out of his patrol car and walking to the passenger side of the Tahoe.  Trooper Seiber testified that he did not know how many occupants were in the Tahoe when he pulled it over, as the windows were too dark to see inside.  He acknowledged that he did not know if anyone was seated in the passenger seat as he walked up to the Tahoe but that he approached the passenger side because that is how he was trained and how he conducts every traffic stop.  He testified that the purpose of approaching a vehicle in a traffic stop on the passenger side is officer safety, as written in the Tennessee Highway Patrol general orders.

As Trooper Seiber approaches the passenger side of the Tahoe, he asks Partee to roll down the rear passenger window, which he testified was for his safety.  He then walks up to the front passenger window and tells Partee that he wants to check the window tint, and Partee partially rolls up his window.  Trooper Seiber utilizes his window-tint meter to determine the tint is 4%, which he describes as "way too dark" in Tennessee and Mississippi.[1]  Trooper Seiber testified that window tint is measured by visible light transmission.  A window measured at 100% has 100% of light transmitting through it; a window measured at 0% is completely dark, with no light passing through.  The Tahoe's windows measured at 4%, which Trooper Seiber described as next to nothing.

Partee offered a version of events that differs in key aspects.  He testified that the Tahoe was driven that day by Aaron Redick, a close family friend whom Partee calls his uncle, and Partee was riding in the front passenger seat, with no other occupants.  They had left Redick's

---

[1] The Tahoe had Mississippi a license plate; the stop occurred in Tennessee.

mother's house (Partee testified he did not know the address) and had been driving for about fifteen minutes when they were pulled over.

Partee testified that they were driving with the driver and front passenger windows down because the fourteen-year-old Tahoe's air conditioner did not work and it was "kind of warm" and "kind of sunny" outside.

Partee testified that they had driven down Perkins and stopped at the stop sign at the intersection of Perkins and Cottonwood before taking a left on Cottonwood. Partee testified that he saw Trooper Seiber "right there to the right of me sitting at the corner" of Cottonwood and Perkins. He testified that, when he saw Trooper Seiber, his window was down, and he and his uncle were talking. Once Redick turned left on Cottonwood, another truck got behind the Tahoe, and then Trooper Seiber got behind that truck and turned on his blue lights. Partee estimated that three to four minutes had passed between seeing Trooper Seiber and getting pulled over.

On cross-examination, Partee admitted that, when Trooper Seiber pulled them over, Partee lied to Trooper Seiber by giving him a false name and birthdate. When Trooper Seiber asked Partee his age, the age he provided did not correlate with the false birthdate he had given.

During the traffic stop, the Tahoe was eventually searched, and a firearm was recovered. Partee testified that neither the firearm nor some suspected cocaine also found in the Tahoe was his. He admitted to using cocaine ten years ago but denied attempting to sell cocaine.

On November 26, 2025, a criminal complaint was sworn against Partee for knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) On December 18, 2025, a federal grand jury returned an indictment against Partee with that charge. (ECF No. 17.)

5

**PROPOSED CONCLUSIONS OF LAW**

Partee seeks suppression of the firearm as the fruit of an illegal stop and search unsupported by probable cause.  "The government has the burden of proving the legality of a warrantless search."  *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (citing *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002)).

"The stop of a vehicle qualifies as the 'seizure' of a 'person' that must be 'reasonable' under the Fourth Amendment."  *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).  "[O]fficers may stop a car as long as they objectively have probable cause that an occupant of the car has committed a traffic offense . . . ."  *Id.* at 599 (citing *Whren v. United States*, 517 U.S. 806, 811–16 (1996)).[2]

The dispute on this issue is a factual one: whether the windows of the Tahoe were rolled up or down when Trooper Seiber first saw the car.[3]  If the windows were rolled up, Trooper

---

[2] *Brooks* acknowledges a lack of clarity in the Sixth Circuit as to "whether we continue to require probable cause for a stop if officers believe that an occupant has committed only a *civil* traffic offense," such as a window-tint violation.  *Id.* (citing *United States v. Shelton*, 817 F. App'x 217, 219 & n.2 (6th Cir. 2020); *United States v. Taylor*, 471 F. App'x 499, 510–11 (6th Cir. 2012)).  In *Shelton*, the court stated that "in the context of 'ongoing' traffic violations—like a blocked license plate or, more relevantly, an overly tinted window—we have held, and the parties agree, that the less demanding 'reasonable suspicion' standard applies."  817 F. App'x at 219 (citing *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008)).  The court noted the possibility that "confusion remains on the subject," citing *Taylor*'s discussion of conflicting Sixth Circuit authority regarding the standard, but felt no need to resolve that confusion because the parties had agreed to apply the reasonable-suspicion standard.  Here, the parties are aligned in applying probable cause as the standard, and, because the undersigned finds the United States has satisfied that standard, there is similarly no need to resolve the question here.  *See, e.g.*, *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) ("Thankfully, we need not address this question today because where an officer possesses probable cause, he necessarily possesses reasonable suspicion." (citing *Brooks*, 987 F.3d at 598)).

[3] Counsel for Partee confirmed at the hearing that the motion to suppress raises only that one question and that, if Trooper Seiber's testimony is credited over Partee's, that finding is determinative.  There is no dispute, for example, that the Tahoe's windows were darkly tinted in violation of Tennessee and Mississippi law.

6

Seiber had probable cause to stop the Tahoe for a window-tint violation; if the windows were rolled down, the stop was without probable cause and suppression could be warranted. Because the parties presented conflicting testimony on that question, the resolution comes down to witness credibility. The Court makes that credibility determination based on a preponderance-of-the-evidence standard. *See United States v. Jones*, 128 F. App'x 490, 493 (6th Cir. 2005) (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Vaughn*, 429 F. Supp. 3d 499, 529 (E.D. Tenn. 2019) (quoting *United States v. Caldwell*, No. 1:13-cr-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015)).

The United States has established by a preponderance of the evidence that the windows were rolled up when the Tahoe drove past Trooper Seiber on Cottonwood. There is no factual dispute that Trooper Seiber had a clear view of the Tahoe and the status of its windows at that time—all agree that he was close to the Tahoe and that it was a bright, sunny day.

Trooper Seiber testified multiple times that, in that initial close encounter on Cottonwood, he saw that the Tahoe's windows were rolled up. He also testified that his colleagues had independently noticed the same window-tint issue with the Tahoe. He provided further consistent information that the chilly weather meant that no one had their windows down. And he reasonably testified that the Tahoe's windows were rolled down at some point in the one minute between him first seeing the Tahoe and when his bodycam video shows the Tahoe parked with the front windows down.

Trooper Seiber's testimony was credible. He is a veteran officer with extensive experience in and specific training on investigating window-tint violations. His testimony was

detailed, his memory of the stop was clear, his demeanor was calm and assured, and his tone was certain and unwavering.

Partee's testimony, on the other hand, suffers from a significant credibility issue. Partee admitted that he lied to Trooper Seiber about his name and birthdate during the stop, which calls into question the credibility of the testimony he offered at the hearing. *See* Fed. R. Evid. 608(a) ("A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness . . . .").[4]

Partee offers several arguments to attack the credibility and reliability of Trooper Seiber's testimony. His primary argument is that Trooper Seiber participates in so many window-tint traffic stops that he is simply remembering this event incorrectly. As discussed above, however, Trooper Seiber's testimony was specific and detailed, neither his words nor his demeanor

---

[4] The Court also notes that the parties offered differing testimony on where Trooper Seiber first saw the Tahoe. Trooper Seiber testified that he was parked at the intersection of South Goodlett and Cottonwood; Partee testified that Trooper Seiber was parked at the intersection of Perkins and Cottonwood. Partee specifically testified that the Tahoe was "coming down Perkins and Cottonwood at that stop sign right there. We stopped at that stop sign right there. . . . [Trooper Seiber] was sitting right there on Cottonwood and Perkins, right there to the right of me sitting at the corner." The intersection of Perkins and Cottonwood, however, is regulated by a traffic light, not a stop sign, whereas the intersection of Cottonwood and South Goodlett, about a mile to the west, is regulated by a four-way stop sign with flashing red lights—all of which are generally known and indisputable facts subject to judicial notice. *See* Fed. R. Evid. 201. The bodycam footage further confirms Trooper Seiber's testimony that he was at South Goodlett and Cottonwood—a stop sign and flashing red light are seen at the beginning of the bodycam video as Trooper Seiber begins driving. In addition, Trooper Seiber testified that he pulled over the Tahoe as it turned left onto Dearing Cove, and the video confirms that he took a left turn. Dearing Cove is to the north of Cottonwood; if the Tahoe had been traveling down Cottonwood from Perkins towards Dearing Cove, it would have made a right turn on Dearing Cove. The evidence therefore indicates that Trooper Seiber's testimony as to his initial location is more reliable than Partee's. That finding is not, however, necessary to the recommendation herein; the Court would still credit Trooper Seiber's testimony about whether the windows were up or down over Partee's regardless.

expressed any uncertainty, and he provided multiple details that logically corroborated his version of events.

Partee also relies on the unassailable video evidence showing that the windows were down when Trooper Seiber pulled the Tahoe over. That undisputed fact is not, however, inconsistent with Trooper Seiber's testimony that the windows were up when he first saw the Tahoe about a minute before. One minute was sufficient time to roll down the windows, and Trooper Seiber testified that vehicle occupants commonly roll down their windows when they are pulled over in a traffic stop. Partee similarly notes that the United States has presented no video evidence showing the windows rolled up and no audio recording of the troopers' conversation about the Tahoe, but the lack of that additional corroborating evidence does nothing to call into question the credibility or reliability of Trooper Seiber's testimony.

Nor does Partee's testimony about the lack of air conditioning in the Tahoe change the outcome. Though Partee's explanation of why the windows were down on a chilly day makes logical sense, it does not overcome the credibility issues discussed above and is insufficient to convince the Court to accept Partee's version of events.

Finally, Partee challenges Trooper Seiber's credibility by noting first that, though Trooper Seiber testified it was cold that day, he was not wearing a coat. Trooper Seiber credibly testified, however, that he was wearing Kevlar and that he is typically hot and frequently goes without a coat. Partee also notes that, though Trooper Seiber testified he could not see into the Tahoe because the windows were rolled up and darkly tinted, he walked up to the passenger side of the Tahoe when he stopped it, implying he knew someone was in the passenger seat. Trooper Seiber credibly testified, however, that he always approaches a vehicle on the passenger side, as he is trained to do. Neither of these facts undermine Trooper Seiber's credibility.

9

On balance, the Court credits the testimony of Trooper Seiber over that of Partee. As such, the United States has proven by a preponderance of the evidence that the front windows of the Tahoe were rolled up when Trooper Seiber first saw it, such that he saw that the windows were darkly tinted, providing probable cause for the traffic stop. It is therefore recommended that the motion to suppress be denied.

### RECOMMENDATION

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 1st day of July, 2026.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

### NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.